NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LI'L GENERAL STORES, INC.,
Respondent.

No. 27538.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1970.

Rehearing Denied and Rehearing En
Banc Denied May 11, 1970.

ments; by promising benefits; by increasing work loads and written warning notices; and by withholding a company wide wage increase from the employees involved in this proceeding.

The Board also found that the Company had violated § 8(a) (3) and (1) of the Act by discharging Union adherents Tambor, Sowers, and Martinez for the purpose of discouraging membership in the Union and defeating the Union drive for collective bargaining rights.

■ These findings are supported by substantial evidence on the record, considered as a whole, Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Transway, Inc., 5 Cir., 1969, 410 F.2d 368.

There are other issues in the case, which will be discussed at a later point.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Harold A. Boire, Director, Region 12, N. L. R. B., Tampa, Fla., Allan M. Elster, Miami Beach, Fla., R. W. D. S. U., Local 885, Paul J. Spielberg, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Robertamarie Kiley, Atty., N. L. R. B., Washington, D. C., for petitioner.

Glenn L. Greene, Jr., W. Reynolds Allen, Jesse S. Hogg, Greene, Hogg & Allen, Miami, Fla., for respondent.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board issued against Li'l General Stores, Inc., 170 N.L.R.B. No. 94 [March 28, 1968].

Agreeing with the Trial Examiner, the Board found that the Company violated § 8(a) (1) of the Act by coercive interrogation of its employees; by threats to discharge employees and hire replace-

## I

The fact are as follows. Li'l General Stores is a retail food chain, operating extensively in the State of Florida. This labor dispute stems from the ten stores of District 7 of the West Palm Beach Division. The Union began organizational efforts on December 1, 1966. Within the following week nineteen of the twenty-three employees involved had signed authorization cards. The Union forthwith [December 9] petitioned for a representation election.

The election was held on March 10, 1967.

In the meantime, company counsel and two assistant managers visited each of the stores in question. The Trial Examiner credited testimony that counsel announced, from store to store, that the Company would stop the Union "by any means" and that rather than have a union the Company would close "all ten stores" and "replace all the employees of the district".

Prior to the beginning of the union activity, the Company had decided that a general wage increase was in order. Effective January 22, the increase was given all employees of the West Palm

Beach Division except those in District 7.

New disciplinary measures were instituted in District 7. Supervisory calls increased from approximately three per week to two and three per day at each store and the Company began issuing written warning notices for employees who failed to perform the most insignificant tasks.

The Company discharged three known Union supporters. Kenneth Tambor was first transferred from his own store to one that was in a very poor condition. There was a very heavy volume of business at the latter establishment. The day Tambor took over the new store, a supervisor arrived and gave him a ten page list of deficiencies. In an effort to improve these conditions, Tambor returned to the store at night, with his wife and son to help him. Working day and night soon took its toll and Tambor became ill and missed five days of work, whereupon he was fired.

William Sowers was dismissed on the accusation of getting his cash register out of balance. The employee working the afternoon shift, however, had counted the money and found a surplus rather than a deficiency. A request for a recount of the money was refused. Sowers also received eight warning notices for such shortcomings as a failure to post his health card and failure to put away a grocery order.

Felix Martinez was fired for failing to make price changes, for failing to keep the floor and shelving clean, and for allowing trash to accumulate outside. As to the last item, there was evidence that the outside parking area was shared with a hamburger establishment which remained open an hour or more after the store had closed. So, it would have been necessary for Martinez to remain at the store for an additional two hours, if he were to clean a parking area for which the store was only partially responsible.

In this state of the record, and we have recited only a small portion of it, we cannot say that the Board was not entirely justified in ordering the Company to cease and desist from the unfair labor practices found and from interfering with the employees in the exercise of the rights guaranteed by the statute. Moreover, the Board order requiring the Company to offer reinstatement to Tambor, Sowers, and Martinez and to make them whole for loss of pay is due to be enforced. Additionally, we enforce the order requiring the Company to pay the District 7 employees the wage increase wrongfully withheld. The cases are legion but all this, without further citation, is clearly commanded by the principles emphatically confirmed in N. L. R. B. v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

## II

■ On February 10, 1967, the Regional Director, after a representation hearing, concluded that the District 7 store employees constituted an appropriate unit for bargaining and scheduled an election for March 10, 1967. We perceive no basis in the facts of this case for a holding here that this was not an appropriate bargaining unit. The Company argues that a division consisting of seven districts instead of one would be a more appropriate unit, citing N. L. R. B. v. Davis Cafeteria, Inc., 5 Cir., 1968, 396 F.2d 18. In *Davis Cafeteria* two units of an eight unit cafeteria were found to be an inappropriate bargaining unit where there was no "sort of local managerial authority over substantive subjects of collective bargaining". We are of the view that *Davis Cafeteria* is inapposite to the facts in this case. It is no authority for the contention of the present respondent that a division of seventy stores is, for bargaining purposes, preferable to a unit of ten. Actually, the Board may choose among several appropriate units and such a choice will be overturned in the courts only for an abuse of discretion, N. L. R. B. v. Quaker

**574**

City Life Insurance Company, 4 Cir., 1963, 319 F.2d 690.

■ The Board found that District 7 was a "self-contained unit substantially autonomous in its daily operations". In order to test the Board's findings the criteria employed in N. L. R. B. v. Sun Drug Company, 3 Cir., 1966, 359 F.2d 408, should be applied. Factors cutting toward autonomy are: geographic separateness of the store or stores in question, minimal interchange of employees between the unit stores and other stores, and supervision by an official who has significant influence over decisions bearing on the collective bargaining process, and absence of a demand to represent the employees on a wide scale.

■ Each of the above criteria is met perfectly except as to supervision by someone whose decisions bear heavily on decisions involving the collective bargaining process. Lack of final authority by supervisors is not decisive if they have "considerable influence in the final decision with respect to * * * personnel matters" like "hiring, firing, and granting of raises". Continental Insurance Company v. N. L. R. B., 2 Cir., 1969, 409 F.2d 727, 728, 729; Singer Sewing Machine Company v. N. L. R. B., 4 Cir., 1964, 329 F.2d 200, 12 A.L.R.3d 775.

The Company's final argument in favor of division wide bargaining is one of administrative convenience. They argue that the division is a "company within a company" while the district is a "fluid and frequently changing small group of stores". Such a plea of convenience was recently rejected by the Third Circuit in N. L. R. B. v. Western and Southern Life Insurance Company, 3 Cir., 1968, 391 F.2d 119. The Court reasoned that according primary importance to the wishes of the employees comports with the Board's statutory obligation to select units which "assure to employees the fullest freedom in exercising the right guaranteed by the Act". 29 U.S.C. § 159(b).

## III

Upon setting aside the election because of the Company's coercive conduct, the Board ordered Li'l General Stores to bargain with the Union. That action presents the most substantial issue in this case.

As previously stated, in early December, 1966, the Union received nineteen authorization cards from a total of twenty-three employees. The cards, on their face, plainly and unequivocally named the Union for collective bargaining purposes. *The Union, however, did not use the cards to claim a majority or to demand recognition. Instead, it chose to petition for an election.*

On election day, twenty-eight employees were eligible to vote. Of these, fifteen were in the unit when the authorization cards were signed and thirteen had subsequently been transferred in by the Company. There is, however, no allegation that the transfers constituted an unfair labor practice. There were eight votes for the Union and sixteen against.

Because of the unfair labor practices herein recited the Board set the election aside and, on the strength of the authorization cards, ordered the Company to bargain with the Union.

■ It is not to be disputed that where a union has been validly designated as the bargaining representative by the execution of authorization cards and recognition has been demanded the employer may not dissipate that majority or prevent a fair election by coercive conduct. In the event of such a dissipation the Board may issue a bargaining order against the employer if the Board finds that the possibility of erasing the effects of such practices and of ensuring the employees a fair election by the use of traditional remedies is slight and if employee sentiment once expressed through cards can, on balance, be better protected by the issuance of a bargaining order, N. L. R. B. v. Gissel Packing Company, *supra.*

The difficulty with the application of this principle to the pending issue, however, is found, as already indicated, in the fact that the Union here did not claim a majority when the cards were obtained and did not demand recognition. Without any claim or demand it petitioned for an election.

In two cases we have had an opportunity to apply Gissel. See N. L. R. B. v. American Cable Systems, Inc., 5 Cir., 1969, 414 F.2d 661; N. L. R. B. v. Cedar Hills Theatres, Inc., 5 Cir., 1969, 417 F.2d 612. In both cases the cards were presented and recognition demanded in advance of the election.

The gist of the problem is that, relying on Gissel, we are now urged to hold that a union, at its option, may use the authorization cards as hole cards and if it loses an invalid election a Board Order to Bargain may issue because of the prior existence of the cards. At first blush, to approve such tactics could result in tremendous damage to the representation process, throwing it into disarray and uncertainty, results clearly not authorized or contemplated by the Act.

This, however, was not the issue in the Gissel case. The unions there did not hold the cards pending the outcome of an election. They used them in advance. They claimed a majority and demanded recognition.

Obviously, if the employer had not been guilty of coercively unfair labor practices the election now in question could not have been set aside. It follows that all the employer would have had to do to avoid the result now sought would have been refrain from the proscribed conduct.

On the other hand, we are troubled by the fact that on election day there were only nine employees, out of a total of twenty-eight, who had signed cards in December, 1966. Significantly, the transfer of thirteen new employees into the unit was not found to have been an unfair labor practice.

 If a majority of the present employees desire representation by the Un-

ion it should not require long to sign new cards, claim a majority, and demand recognition. If this were done, however, the employer could petition for another election, thus delaying matters and taking advantage of its own wrong. The Board need not allow the Company to profit by its own misdeeds. See Independent, Inc. v. N. L. R. B., 5 Cir., 1969, 406 F.2d 203; N. L. R. B. v. Goodyear Tire and Rubber Company, 5 Cir., 1968, 394 F.2d 711.

In view of the unfair labor practices revealed in this record, and they were extensive if not bordering on the flagrant, it may now be impossible to get a majority to sign cards. The coercively attained dissipation may have long range effect.

This Court now stands between two possibilities. With only nine card signers left in the unit, the Union may no longer represent a majority of the employees. On the other hand, what the Board ordered in this case may be the only effective way to deal with the unfair labor practices which the employer voluntarily committed. At the bottom of it all, the dilemma is due to the deliberate choice of the Union not to present its cards, claim a majority, and demand representation. Again, can the Union "lie behind the log", with cards in hand, until it loses an election, even if because of coercive activity by the employer, and then successfully come forth with the assertion that, after all, the election was a farce because it had a majority all along and had the cards with which to prove it?

We conclude that we do not presently have before us an adequate record upon which to resolve the dilemma. Within the general rationale of Gissel, if the employer knew when the election was requested that the Union held cards representing a majority of the employees we would not hesitate, on the known facts in this case, to enforce the order to bargain as being the best, if not the only, way to preserve the purposes of the Act. We say this because the Company could not have been prejudiced by a failure to

**576**

present the cards if, in fact, it acted with knowledge of their actual existence.

We have searched in vain for a finding by either the Trial Examiner or the Board that the Company had such knowledge.

■ We, therefore, remand the case to the Board for findings, supported by substantial evidence, on this issue. If the Company acted with knowledge of the existence of the authorization cards, then the Order to Bargain will be enforced; otherwise, denied and the parties remanded to their further remedies, if any, under the Act.

In all other respects, the Order of the Board will be

Enforced.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is Denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; . Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.