**LONG ISLAND JEWISH–HILLSIDE MEDICAL CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**League of Registered Nurses, District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO, Intervenor-Respondent.**

**Nos. 1297, 1442, Dockets 82–4081, 82–4091.**

United States Court of Appeals, Second Circuit.

Argued June 10, 1982.

Decided July 21, 1982.

---

Ronald H. Shechtman, New York City (Gordon & Schechtman, Richard M. Betheil, New York City, of counsel), for intervenor-respondent.

Robert M. Kaufman, New York City (Proskauer, Rose, Goetz & Mendelsohn, Richard H. Block, New York City, of counsel), for Hospital Ass'n of New York State, amicus curiae.

Patricia S. Hofstra, Chicago, Ill., for American Hospital Ass'n, amicus curiae.

David H. Diamond, New York City (Guggenheimer & Untermyer, Jerold D. Jacobson, Richard A. Levin, New York City, of counsel), for petitioner.

John H. Ferguson, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for respondent.

Before FEINBERG, Chief Judge, CARDAMONE, Circuit Judge, and SAND,* District Judge.

FEINBERG, Chief Judge:

Long Island Jewish-Hillside Medical Center (the Center) petitions this court to review and set aside an order of the National Labor Relations Board (the Board) dated April 16, 1982 that found that the Center had unlawfully refused to bargain with the League of Registered Nurses, District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO (the Union). The Board has filed a cross-application for enforcement of its order. The Union has intervened in these proceedings, and the Hospital Association of New York and the American Hospital Association have filed briefs as amici curiae. Because we find that the Board applied an inappropriate standard in determining the proper bargaining unit, we remand for further proceedings.

### I.

In June 1981, the Union filed a representation petition with the Board seeking certification as the exclusive bargaining representative of the registered nurses employed at the Center's facility in Manhasset, New York. After five days of hearings in July, the Board's Regional Director issued a Decision and Direction of Election in August 1981 in which he found appropriate for collective bargaining the following unit of employees:

All full-time and regular part-time registered nurses, including staff nurses, nurse practitioners, assistant nursing care coordinators, and per diem staff nurses employed by the [Center] at its Manhasset division ..., excluding all other employees, clinical nurse specialists, guards, and supervisors as defined in the Act, including the director of nursing, associate director of nursing, assistant directors of nursing and nursing care coordinators.

In September 1981, the Center filed a Request for Review of this decision, alleging, inter alia, that the Regional Director erred in finding that a unit of approximately 80

registered nurses limited to a single division, rather than one encompassing 630 nurses at all the relevant divisions, was appropriate. The Board denied the Center's Request for Review in October 1981. That same day, the Regional Director conducted an election in which a majority of employees selected the Union as their bargaining representative. Two weeks later, the Regional Director issued a Certification of Representative to the Union, making it the exclusive bargaining representative for the unit.

Thereafter, the Union asked the Center to bargain with it, but the Center refused in order to obtain further review of the appropriateness of the bargaining unit. In April 1982, the Union filed an unfair labor practice charge, alleging that the Center had violated sections 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (5). The Center admitted its refusal to bargain but challenged the appropriateness of the unit and the validity of the certification. On April 16, 1982, the Board issued its Decision and Order, granting the General Counsel's motion for summary judgment and finding that the Center had violated the Act. The Board required the Center to cease and desist from its unfair labor practices, to refrain from interfering with its employees' rights in any like or related manner, to bargain with the Union upon request and to post appropriate notices. This petition for review and cross-application for enforcement followed.

II.

The crux of this controversy is whether a unit of registered nurses limited to one of several divisions is appropriate or whether the unit must encompass all of the Center's divisions. The evidence before the Board indicated that the Center is a non-profit voluntary health care institution, which employs registered nurses at three operational divisions: the Hillside division, the Long Island Jewish division and the Manhasset division. The Hillside division mainly provides intermediate term care, while the Long Island Jewish and Manhasset divisions provide medical services on a short-term basis to acutely ill patients. The Center operates under a single, center-wide "operating certificate" issued by the New York State Department of Health, and it is a single entity under the New York State Hospital Code and the standards of the Joint Commission on Accreditation of Hospitals. It has a single reimbursement rate for the cost of patient care anywhere within the Center. The annual budget and the financial and audit report are prepared on a center-wide basis.

The Center is governed by a board of trustees, with everyday administration delegated to the president. A senior vice-president has direct day-to-day responsibility for the operation of the three divisions and reports to the president. The Corporate Management Council is the highest administrative decision-making body. It receives recommendations regarding administrative and personnel policies from the Management Council and other suggestions regarding programs and policies from the Executive Management Committee. These recommendations and suggestions are formulated on a center-wide basis. Personnel, purchasing, community relations, employees' health service, management planning, grants management, risk management, and laboratory and medical records are handled on a center-wide basis; thus, if a patient needs treatment unavailable in one division, he can easily be transferred to another division to obtain the required care.

The Center acquired the Manhasset division in June 1981 to alleviate a chronic shortage of beds. The Manhasset division is located about five miles from the Center's unified campus in New Hyde Park, New York. When construction of a new medical facility on the main campus is completed in the next few years, the Center plans to relocate the Manhasset beds at its Long Island division. At that time, Manhasset will cease to be an operating division of the Center and will be converted to some other use. Manhasset employees will be transferred to the Long Island division with perhaps some reduction in number due to attrition.

Although the Regional Director found that administrators at Manhasset continue to exercise substantial control over day-to-day operations, they cannot formulate hospital policy and are bound by the centralized administration's directives, in particular, those of the Director of Nursing. After acquiring the Manhasset facility, the Center altered the division's supervisory structure and titles somewhat to conform to those at other divisions. With respect to personnel decisions, the Center's Associate Director of Nursing for Administration screens applicants for nursing positions before sending them over to the Manhasset division for interviews. The Director of Nursing makes final decisions as to hiring, although she accords great weight to the recommendations of supervisory authorities at Manhasset. The Center also claims that job openings are posted on a center-wide basis, although the Regional Director found that official postings for certain positions had not been placed at the Manhasset division. The Regional Director also found that there had been virtually no transfers between Manhasset and the other divisions since the acquisition. Although the Center alleged that there were ample opportunities for contact between nurses at the various divisions, the Regional Director found that only minimal contact had in fact occurred.

Because the registered nurses at Manhasset had been represented by the Union prior to the merger with the Center, their terms and conditions of employment were somewhat different. Because the Center had agreed to honor the existing collective bargaining agreement covering the Manhasset nurses, these differences persisted at the time of the representation hearing, which occurred only shortly after the acquisition. In particular, the nurses at Manhasset received somewhat lower salaries, had different pension plans, could not participate in the Center's credit union and worked slightly different hours. In contrast to the nurses at the other divisions, the Manhasset nurses had a contractual right to seek binding arbitration. The Center argued that any such differences were merely transitory, however, and that when the collective bargaining agreement expired on October 1, 1981, the Center planned to eliminate these disparities.

On this record, the Regional Director concluded that a bargaining unit limited to the nurses at the Manhasset division was appropriate, citing its substantial autonomy with respect to day-to-day operations, the lack of transfers and the minimal contact among nurses at the three divisions, and the persistent differences in terms and conditions of employment. In weighing this evidence, the Regional Director relied on the presumption that a single-facility bargaining unit is appropriate where there is no bargaining history in a more comprehensive unit and the degree of functional integration with other facilities is insufficient to negate the separate identity of the unit sought to be represented. In applying this presumption, the Regional Director concluded that a congressional admonition against proliferation of bargaining units in the health care industry "ha[d] no bearing on the question of unit scope, as opposed to unit composition."

III.

On appeal, the Center primarily attacks the Board's application of the single-facility presumption to the health care industry as inconsistent with congressional intent. In 1974, Congress extended coverage of the National Labor Relations Act to all private health care institutions, including non-profit facilities. S.Rep.No. 766, 93d Cong., 2d Sess. 1, reprinted in 1974 U.S.Code Cong. & Ad.News 3946; S.Conf.Rep.No. 988, 93d Cong., 2d Sess. 1, reprinted in 1974 U.S. Code Cong. & Ad.News 3959. In doing so, Congress sought to achieve dual objectives: (1) the extension of rights guaranteed by the Act to non-profit hospital employees, whose working conditions and pay had been quite substandard; and (2) the provision of adequate safeguards to protect the public against disruption of health care services due to labor disputes. Bumpass, Appropriate Bargaining Units in Health Care Institutions: An Analysis of Congressional Intent and Its Implementation by the Nation-

al Labor Relations Board, 20 B.C.L.Rev. 867, 871 (1979); Feheley, Amendments to the National Labor Relations Act: Health Care Institutions, 36 Ohio St.L.J. 235, 240–42 (1975).

Congress was extremely concerned that the proliferation of bargaining units in the health care industry might lead to disruptions in patient care. Bumpass, supra, at 871–74; Feheley, supra, at 287–89. It therefore expressly noted in reports accompanying the amendments that "[d]ue consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry." S.Rep.No. 766, supra, at 5, reprinted in 1974 U.S.Code Cong. & Ad.News at 3950; H.Rep.No. 1051, 93d Cong., 2d Sess. 6 (1974). Various Congressmen echoed this concern. For example, Senator Taft, who was a major figure in enactment of the 1974 amendments, remarked on May 2, 1974 that:

> The issue of proliferation of bargaining units in health care institutions has also greatly concerned me during consideration of legislation in this area. Hospitals and other types of health care institutions are particularly vulnerable to a multiplicity of bargaining units due to the diversified nature of the medical services provided patients.
>
> \*   \*   \*   \*   \*   \*
>
> I cannot stress enough ... the importance of great caution being exercised by the Board in reviewing unit cases in this area. Unwarranted unit fragmentation leading to jurisdictional disputes and work stoppages must be prevented.
>
> The administrative problems from a practical operation viewpoint and labor-relation viewpoint must be considered by the Board on this issue. Health-care institutions must not be permitted to go the route of other industries, particularly the construction trades, in this regard.

In analyzing the issue of bargaining units, the Board should also consider the issue of the cost of medical care. Undue unit proliferation must not be permitted to create wage 'leapfrogging' and 'whipsawing'. The cost of medical care in this country has already skyrocketed, and costs must be maintained at a reasonable level....

The committee, in recognizing these issues with regard to bargaining unit determination, took a significant step forward in establishing the factor of public interest to be considered by the Board in unit cases.

120 Cong.Rec. 12944–45 (1974). While wishing to accord the Board some flexibility in making unit determinations, other legislators also stressed the importance of avoiding undue proliferation in the health care industry. Id. at 22575, 22948–49 (remarks of Sen. Williams and Rep. Ashbrook).[1]

All of this convinces us that Congress intended that the Board exercise its discretion to prevent undue proliferation of bargaining units that could disrupt health care services. See generally Bumpass, supra, at 871–901 (legislative history of 1974 amendments with respect to nonproliferation of bargaining units). It is true that congressional discussion of unit proliferation focused on unit composition, i.e., the types of employees to be included in a bargaining unit, rather than on unit scope, i.e., whether the appropriate unit includes employees at a single facility or at several. But we do not believe that Congress would permit its general policy goals to be undermined through fragmentation of the scope of bargaining units at multi-facility health care institutions. Whether a large number of bargaining units results from decisions as to scope or composition, fragmentation is likely to produce disruption of health care services, inefficient bargaining with labor or-

---

1. After passage of the amendments, Congressman Thompson inserted remarks in the record, stating that "the committee did not intent to foreclose the Board from continuing to determine traditional craft and departmental units, such as stationary engineers in the health care field." 120 Cong.Rec. 22948 (1974). Because these comments could not have influenced deliberations on the amendment, they deserve little, if any, weight in assessing congressional intent. Bumpass, supra, at 879–82. In any event, this isolated statement is clearly outweighed by the strong evidence of a contrary legislative intent cited in the text.

ganizations, whipsawing and resultant increases in health care costs. Pepe & Keith, Health Care Labor Relations Law—Understanding the Issues, 7 Employee Relations L.J. 235, 242–43 (1981). Thus, if the Board focuses on questions of composition to the exclusion of those regarding scope, it will defeat the very purpose of the congressional admonition against proliferation.[2]

Another circuit has considered this question and has also concluded that the congressional concern with proliferation of units must embrace issues of scope as well as composition. In *Presbyterian/St. Luke's Medical Center v. NLRB*, 653 F.2d 450 (10th Cir.), petition for cert. filed, —— U.S. ——, 102 S.Ct. 1608, 71 L.Ed.2d 846, a union sought to represent the registered nurses at a facility that had operated independently before merging into a medical center. The medical center argued, inter alia, that the Board's application of the single-facility presumption violated the congressional mandate to avoid excessive fragmentation of bargaining units in the health care industry. The Tenth Circuit agreed. Although it accepted the Board's claim that the legislative history of the 1974 amendments focused on questions of composition, it "d[id] not agree . . . that this concern necessarily demonstrates congressional insensitivity to proliferation problems caused by mechanical application of the presumption to issues of unit scope. Nor do we believe Congress' silence in this area blindly constituted ratification of the single facility presumption in health care facilities." Id. at 454. Because the Board had applied an inappropriate

standard, the Tenth Circuit remanded the case for further consideration. On remand, it instructed the Board to weigh the traditional factors used in making scope determinations against the public interest in preventing proliferation in the health care field and required the Board to specify how its unit determination reflected the congressional admonition. Id. at 455.

In contrast to the Tenth Circuit's persuasive view, the Board's decisions with respect to the propriety of the single-facility presumption in the health care context are in a state of disarray. In recent decisions, the Board seems to have applied the presumption based on its narrow reading of the legislative history as extending only to matters of unit composition. Samaritan Health Services, Inc., 238 N.L.R.B. 629, 632 (1978); National G. South, Inc., 230 N.L.R.B. 976, 978 n.5 (1977). Yet, shortly before these decisions, the Board had expressly recognized that the mandate against undue proliferation was germane to issues of unit scope. Kaiser Foundation Health Plan of Oregon, 225 N.L.R.B. 409, 411 & n.8 (1976). See generally Pepe & Keith, supra, at 242–44 (describing inconsistency of Board's decisions regarding single-facility presumption). In view of the Board's own uncertainty as to the applicability of the single-facility presumption, we believe it especially important to establish needed consistency in this area. We conclude that the single-facility presumption is inapplicable in the health care context.[3]

In reaching this conclusion, we do not mean to denigrate the Board's concern with

---

**2.** We note that even with respect to issues of unit composition, the Board has been reluctant to give effect to Congress's policy against undue proliferation of bargaining units in the health care industry. Recently, not only has the Board applied traditional industrial criteria to determine the composition of health care bargaining units in the face of a clear congressional mandate, but it has also ignored federal court decisions establishing standards that more closely conform to congressional intent. E.g., *Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858, 864 (7th Cir. 1980); *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 969–71 (3d Cir. 1979); *NLRB v. Mercy Hospital Association*, 606 F.2d 22, 26–28 (2d Cir. 1979), cert. denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980); *NLRB v. St. Francis Hospi-*

*tal of Lynwood*, 601 F.2d 404, 416 (9th Cir. 1979); see generally Husband, Determining Appropriate Bargaining Units in Health Care Institutions—The Gap Widens, 32 Labor L.J. 780, 784–85 (1981); Pepe & Keith, supra, at 236. This general recalcitrance renders somewhat suspect the Board's narrow interpretation of the admonition as encompassing only matters of unit composition.

**3.** We are aware of our recent decision in *NLRB v. J. W. Mays, Inc.*, 675 F.2d 442 (2d Cir. 1982) (per curiam), relied on by the Board. In *Mays*, however, we simply declined to follow the Tenth Circuit's approach in *Presbyterian/St. Luke's* outside of the health care industry. Id. at 443–44. As the Tenth Circuit's opinion made clear, its approach was tied to policy

ensuring representation to employees who desire it. After all, as previously noted, one goal of the 1974 amendments was to accord union representation to employees who had generally been undercompensated. We also recognize the Board's legitimate interest in preserving existing representation where there is a history of collective bargaining as a separate unit. See *Bay Medical Center, Inc. v. NLRB*, 588 F.2d 1174, 1177–78 (6th Cir. 1978), cert. denied, 444 U.S. 827, 100 S.Ct. 53, 62 L.Ed.2d 35 (1979). Yet, we believe that these competing policy considerations must be weighed against the public interest in nonproliferation without the introduction of burden-shifting presumptions. Cf. *NLRB v. Mercy Hospital Association*, 606 F.2d 22, 27 (2d Cir. 1979), cert. denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980) (requiring Board to balance traditional community of interest factors against public interest in preventing fragmentation in health care field in determining composition of bargaining units). Because the use of the single-facility presumption may have improperly tipped the balance in favor of certification, we must reverse and remand for further proceedings consistent with this opinion.[4]

considerations peculiar to health care institutions.

4. In addition to its claim that the Board inappropriately applied the single-facility presumption in certifying the unit, the Center raises two other contentions on appeal. Although we need not reach these issues in light of our decision that the Board erred in using the single-facility presumption, we address them briefly to provide the Board with adequate guidance on remand. The Center claims that the Regional Director accorded unwarranted importance to differences in terms and conditions of employment between nurses at Manhasset and other nurses, which would be of short duration and which the Center, as a successor employer, was required to respect until the end of an existing labor agreement. We regard the Center's argument as a persuasive one. Although the Regional Director's opinion clearly indicates that he recognized the ephemeral nature of these disparities, his considera-

tion of this evidence may have been affected by his application of the single-facility presumption. Any problem in this regard should be remedied by our requirement that the evidence be reconsidered without applying the presumption.

The Center also urges that the Regional Director's decision here is inconsistent with a prior decision in which he found a single-facility unit of nurses at the Hillside division inappropriate. Long Island Jewish Hillside Medical Center, No. 29–RC–4427 (May 22, 1979). The Regional Director distinguished the earlier decision on the grounds that the Hillside division was more highly integrated into the Center and that the terms and conditions of employment for the Hillside nurses were virtually identical to those of other nurses. We believe that, although the prior decision is helpful to the Center, it does not require the Regional Director to certify a center-wide unit in this case.