CARNATION COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 23255.

United States Court of Appeals, Ninth Circuit.

April 30, 1970.

Rehearing Denied Aug. 12, 1970.

John Bacheller, Jr. (argued), of Fisher & Phillips, Atlanta, Ga., for petitioner.

Herman Levy (argued), Asst. Gen. Counsel, Washington, D. C., Samuel Slaff, Counsel, N. L. R. B., Phoenix, Ariz., Charles M. Henderson, Regional Director, N. L. R. B., Albuquerque, N. M., for respondent.

Before HAMLEY and ELY, Circuit Judges, and GOODWIN,* District Judge.

ALFRED T. GOODWIN, District Judge.

The Carnation Company petitions to set aside a decision and order of the National Labor Relations Board, which found that certain dairy route salesmen were employees rather than independent contractors. 172 N.L.R.B. No. 215, 61 L.R.R.M. 1127 (1968).

Carnation processes and distributes dairy products in interstate commerce. This controversy arose in Phoenix, Arizona, where Carnation was a party to a collective-bargaining agreement with Local No. 274 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers.

On August 1, 1966, two months after executing a new two-year collective-bargaining agreement with Local 274, Carnation negotiated individually with its 25 wholesale and 83 retail route drivers, seeking to enter into distribution agreements. Local 274 challenged these negotiations as bargaining in violation of 29 U.S.C. § 158(a) (1) and (5) [1] and (d).

At the date of the N.L.R.B. hearing, Carnation had entered into distributorship agreements with ten of its wholesale drivers and with 28 of its retail drivers. The Board decided that these agreements were invalid; that the route men were employees who remained covered by the Local 274 bargaining agreement; and that Carnation's bargaining with its drivers violated 29 U.S.C. § 158(a) (1) and (5) and (d). The Board also ordered reinstatement of four discharged drivers, with back pay.

The challenged agreements provide generally as follows:

The wholesale distributors sell exclusively to such wholesale customers as grocery markets, schools, and restaurants. The retail distributors sell primarily to individual householders. Each distributor is granted the exclusive right to sell Carnation's products in a geographic area which Carnation agrees not to change unilaterally.

All distributors purchase their trucks and equipment from Carnation on conditional sales contracts, payable in monthly installments. To secure these contracts,

* The Honorable Alfred T. Goodwin, District Judge for the District of Oregon, sitting by designation.

1. 29 U.S.C. § 158(a)
"It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
"* * *
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

each distributor assigns his accounts receivable to Carnation and executes a "trust" agreement which establishes a joint bank account. All proceeds from each delivery route must be deposited in the joint bank account, from which funds may be withdrawn only over the joint signatures of the distributor and a Carnation representative.

The retail distributors pay each Wednesday for all products delivered to them during the previous seven days. The wholesale distributors pay cash for all products. Distributors pay Carnation's current published dock prices. Carnation suggests retail prices, but the distributors may sell at any prices they see fit.

The distributors are not allowed to sell any competitive dairy product of another producer. A distributor may, however, sell to his customers any noncompetitive products of other manufacturers or suppliers.

Carnation at its option may furnish advertising material which the distributor must install and maintain at his own expense. In the event any such advertising does not meet Carnation's standards, Carnation has the right to require the distributor to meet those standards at his own expense.

The distributor may use only vehicles of which he is the registered owner. He must paint his vehicles in a specific manner and thereafter maintain the condition of the paint to the satisfaction of Carnation.

The distributor is required to carry liability insurance and Workmen's Compensation. Insurance certificates must provide that the insurance company will give Carnation ten days' advance notice of any cancellation or material change.

The distributorship agreement runs for five years, but either party may cancel at any time on 30 days' notice. Carnation also has the right to terminate the agreement upon one-day written notice if the distributor breaches the agreement. If Carnation elects to terminate the agreement because of breach by the distributor, Carnation will take title to any of the distributor's trucks upon which a balance is owing, and Carnation need not account for the distributor's equity.

Upon termination, the distributor must re-sell to Carnation all his accounts receivable. The distributor may not otherwise sell or encumber his receivables. The distributor may not assign his contract without Carnation's prior written consent. Once Carnation buys back a distributor's receivables, the distributor may not compete in the Phoenix area.

Except for the economic controls outlined above, the distributors are free to perform their contracts as they see fit.

Distributors are not required to undergo training at Carnation's direction, nor are they required to attend sales meetings, safety meetings, or other meetings of Carnation's employees. They are not supervised in the serving of their customers.

Distributors set their own hours of work and sequence of deliveries. They need not wear uniforms. They pay their own license fees and taxes. They may obtain health and liability insurance from any qualified source. They buy their gasoline, oil, and garage services from suppliers of their own selection. They hire their own helpers and substitutes.

The distributor's profit is the difference between his operating costs, including his cost for Carnation products, and the price he charges his customers.

Carnation's chief competitor in the Phoenix market area, Shamrock Dairy, Inc., changed from a master-servant delivery operation to an independent-contractor distribution scheme in 1955. See Shamrock Dairy, Inc., 124 N.L.R.B. 494, 44 L.R.R.M. 1407 (1959), and 119 N.L.R.B. 998, 41 L.R.R.M. 1216 (1957), affirmed sub. nom. International Bro. of Teamsters, etc. v. N. L. R. B., 108 U.S. App.D.C. 117, 280 F.2d 665, cert. denied 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960).

Carnation's management decided for economic reasons to follow Shamrock's example and use independent distributors

in the Phoenix area. Carnation's legal advisers, relying upon the *Shamrock* decisions, concluded that the change in distribution method could be made without waiting for the agreement with Local 274 to terminate.

The hearing examiner recognized that Carnation's facts cannot be distinguished from those of *Shamrock*. He rejected, however, Carnation's argument that it would be inequitable to apply to Carnation a different rule than was applied to Shamrock. His only explanation was that to adhere to *Shamrock* would no longer be consistent with Board policy.

The Board decision accepted without comment the examiner's report. In accepting the examiner's recommendations, the Board not only refused to follow *Shamrock*, but also departed from its decision in Pure Seal Dairy Company, 135 N.L.R.B. 76, 49 L.R.R.M. 1434 (1962). Congress, in the meantime, has not changed the law.

This circuit followed *Shamrock* in N. L. R. B. v. Servette, Inc., 313 F.2d 67 (9th Cir. 1962), where, on similar facts, the key issue was the validity of driver-salesman contracts. The General Counsel now argues that we should overrule *Servette* and reject *Shamrock*.

The General Counsel argues that the economic control asserted by Carnation over its distributors is sufficient to justify a determination that the drivers were employees; that this determination has been made on a disputed question of fact; and that the courts, therefore, are without authority to re-examine the Board's findings.

The question requires, however, application of law to facts. NLRB v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); N. L. R. B. v. Marcus Trucking Co., 286 F.2d 583, 590, 591 (2d Cir. 1961).

Section 2(3) of the National Labor Relations Act provides, in relevant part, that the term "employee" shall not include "any individual * * * having the status of an independent contractor * * *." 29 U.S.C. § 152(3). In enacting this provision, Congress did not define the status, but intended that in each case the issue should be determined by the application of general agency principles. NLRB v. United Insurance Co., 390 U.S. at 256, 88 S.Ct. 988.

Under agency principles, each case should be determined on its own facts. Frito-Lay, Inc. v. N. L. R. B., 385 F.2d 180, 188 (7th Cir. 1967). The correct rule of law is not, however, a matter of case-by-case discretion. Correct application of law is a proper subject for judicial review. NLRB v. United Insurance Co., supra.

Restatement (Second) of Agency § 220, at 485–486 (1958), states:

"* * *

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"* * *

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer;

"* * *

"(j) whether the principal is or is not in business."

In an illustrative case, the court said:

"* * * The test usually employed for determining the distinction between an independent contractor and an employee is found in the nature and

the amount of control reserved by the person for whom the work is done. * * * [T]he employer-employee relationship exists only where the person, for whom the work is done, has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished. * * * [I]t is the right and not the exercise of control which is the determining element." Williams v. United States, 126 F.2d 129, 132 (7th Cir.), cert. denied 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527 (1942), quoted and followed in National Labor Relations Board v. Phoenix Mut. L. Ins. Co., 167 F.2d 983, 986, 6 A.L.R.2d 408 (7th Cir.), cert. denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948).

And see Frito-Lay, Inc. v. N. L. R. B., 385 F.2d at 187, quoting with approval Pure Seal Dairy Company, 135 N.L.R.B. at 79.

Evidence of economic control is not necessarily proof of the kind of control that is relevant to a decision whether a person is a contractor or an employee.

Most of the facts which the Board now asserts to be proof of Carnation's retention of the power to control its drivers are facts (economic rights and sanctions) which can be found in a variety of "franchise" arrangements oriented toward brand-name protection and market penetration. In such cases there is no attempt to supervise the details of the work, and no assertion that the franchise holder is anything but an independent business man.

An individual may be an employee for one purpose and an independent contractor for another purpose. In Courtney v. United States, 230 F.2d 112, 57 A.L.R.2d 1444 (2d Cir. 1956), the Court held that an individual was not an employee for purposes of the Federal Tort Claims Act, although he was, for certain other purposes, an employee under state law.

This circuit has applied the "purpose of the statute" test in situations calling for common-law principles. See, e. g., McGuire v. United States, 349 F.2d 644 (9th Cir. 1965); Westover v. Stockholders Publishing Company, 237 F.2d 948 (9th Cir. 1956). The view that an employee for one purpose is an employee for all purposes has been expressed in dissent: see United States v. Silk, 331 U.S. 704, 719, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (Mr. Justice Rutledge dissenting). We reject this view as mechanistic.

We are not unaware of the ingenuity of courts and juries in finding ways for injured plaintiffs to reach solvent defendants. However, to apply mechanically the doctrine of *respondeat superior* to a labor-management dispute would not necessarily advance the purposes of Congress in enacting 29 U.S.C. § 158. See NLRB v. United Insurance Co., 390 U.S. at 256, 88 S.Ct. 988.

The Board doubly errs in this case. Its application of the law to the facts overlooked accepted principles of the law of agency and also failed to follow, distinguish, or overrule its own similar cases. NLRB v. Metropolitan L. Ins. Co., 380 U.S. 438, 442–443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).

In Burinskas v. N. L. R. B., 123 U.S. App.D.C. 143, 357 F.2d 822 (1966), the petitioner-employer contended that the Board erred in ordering a discharged employee reinstated with back pay. The court remanded the case, noting that in similar situations the Board had not ordered back pay. The Court said that even though the Board has broad discretion, it cannot arbitrarily treat similar situations in dissimilar ways. "Merely" asserting that the circumstances are 'unique' or 'unusual' does not provide a proper guideline for the future exercise of the Board's discretion nor does it provide a petitioner with an explanation why his case is being treated in a certain manner." 357 F.2d at 827, citing Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

In N. L. R. B. v. WGOK, Inc., 384 F.2d 500 (5th Cir. 1967), the court reversed the Board's determination that an engineer who worked part-time for a radio station was included in the bargaining group of radio station employees. The court noted that the Board had previously excluded part-time employees who worked on a schedule similar to that of the engineer. "We are mindful that our review of the Board's unit determination is narrowly limited * * * but nevertheless conclude that where the Board makes an unexplained departure from its established criteria for unit determination we should deny enforcement * *." 384 F.2d at 503.

For the foregoing reasons we deny enforcement to the order challenged in this case insofar as it depends upon a finding that the drivers are employees and not contractors.

The Board has filed a cross-application for enforcement, asserting that Carnation is in violation of 29 U.S.C. § 158(a) (1) and (5) and (d) for failure to bargain with Local 274 on the matter of changing the status of route men.

Near the beginning of its negotiations with its drivers, Carnation's general manager telephoned the union business representative and told him that one of the wholesale route drivers was contemplating "buying his route." The union representative responded that Local 274 would resist any attempt by Carnation to change the driver-salesman relationship. An unresolved question of fact in this case is whether there was a refusal to bargain or an impasse.

An employer violates 29 U.S.C. § 158(a) (1) and (5) by entering into individual employment contracts with its employees without dealing with its employees' authorized bargaining representative. N. L. R. B. v. Tom Johnson, Inc., 378 F.2d 342, 343 (9th Cir. 1967); General Teamsters, Chauffeurs & H., Loc. U. No. 782 v. N. L. R. B., 126 U.S. App.D.C. 1, 373 F.2d 661, cert. denied sub nom Blue Cab Co. v. N. L. R. B., 389 U.S. 837, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967); N. L. R. B. v. Tulsa Sheet Metal Works, Inc., 367 F.2d 55, 59 (10th Cir. 1966). See, also, J. I. Case Co. v. National Labor Relations Board, 321 U. S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

In the instant case, it is not disputed that the company executed individual agreements with its drivers. Because the Board found that these drivers had retained their employee status, the Board granted the relief sought by Local 274 and set aside the agreements.

Carnation now argues that if the drivers became independent contractors, even though they did so as the result of unilateral negotiations (a contested issue), the charge of violating Section 8(a) (1) and (5) is moot.

As a practical matter, the independent drivers are no longer employees and are neither covered by Carnation's labor agreement nor likely to be benefited by union efforts on behalf of Local 274, but these considerations do not necessarily moot the question of a past violation by Carnation.

We are of the opinion that the Board ought to pass upon the refusal-to-bargain issue, but that if it finds a violation it ought to fashion a remedy with the understanding that Carnation and its distributors now occupy a different relationship than they occupied when the alleged violation occurred.

The only remaining question is whether four route men who did not elect to enter into independent distributor's agreements, and who eventually terminated their employment under circumstances which the Board found to constitute a violation of 29 U.S.C. § 158(a) (1) and (5) and (d), are entitled to reinstatement with back pay as ordered by the Board.

We have examined the record on this issue, and have concluded that the circumstances of the four terminations were solely questions of fact and that the Board's determination of those facts

should not be disturbed. The remedy, however, ought to be re-examined in light of our holding that Carnation cannot be compelled to distribute its products through employee drivers.

Enforcement is denied, and the case is remanded to the National Labor Relations Board for such proceedings as may be appropriate with reference to unresolved questions of fact and modified remedies for discharged drivers.

ORDER MODIFYING OPINION AND DENYING REHEARING

The Clerk is directed to file the Board's untimely petition for rehearing.

There is also before us the petitioner's 'Motion for Clarification' of our opinion of April 30, 1970. In its petition, the Board has requested that we modify our opinion by providing that on the remand "the Board is not precluded from considering the propriety of ordering restoration of the *status quo ante*" pending bargaining negotiations should it find a violation of the duty to bargain, and that restoration is an appropriate remedy therefor.

We have concluded that because the decision concerning remedies initially lies with the Board, the Board's petition, in part, is well taken. Upon remand the Board is not precluded from ordering any appropriate remedy provided by law, subject, of course, to judicial review.

No remedy, whether for the benefit of Local 274 or for individual drivers, however, can be sustained unless it is predicated upon a finding that Carnation unlawfully refused to bargain. To the extent that our former opinion may have suggested that remedies previously ordered for discharged drivers may be sustained without a finding that Carnation refused to bargain, it is hereby corrected.

As modified, the opinion of April 30, 1970, is adhered to and the petition for rehearing is denied.